## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | Case No. 16-11501 (CSS) |
| MAXUS ENERGY CORPORATION, | ) | |
| et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| JOSEPH J. FARNAN, JR, in his capacity | ) | |
| as LIQUIDATING TRUSTEE OF THE | ) | |
| MAXUS LIQUIDATING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No.: 18-50521 (CSS) |
| | ) | |
| VISTA ANALYTICAL LABORATORY, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>OPINION</u>[1]

**BALLARD SPAHR LLP**
Tobey M. Daluz
Chantelle D. McClamb
919 North Market Street
11th Floor
Wilmington, DE 19801

Counsel for Defendant Vista
Analytical Laboratory, Inc.

**GELLERT SCALI BUSENKELL & BROWN, LLC**
Michael G. Busenkell
Amy D. Brown
1201 N. Orange Street, Suite 300
Wilmington, DE 19801

Counsel for Plaintiff Joseph J. Farnan, Jr.
in his capacity as the Liquidating
Trustee of the Maxus Liquidating Trust

Dated: May 12, 2020
Sontchi, C.J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law under Rule 7052.

## INTRODUCTION

This is a preference action.  Defendant has filed a motion for summary judgment arguing that there is no genuine issue of material fact as to whether it would have been paid the full amount of the purportedly preferential transfers in a hypothetical liquidation under Chapter 7 and, thus, Plaintiff cannot prove its prima facie case under section 547(b)(5) of the Bankruptcy Code.  Defendant bases its argument on the assertion that it was a "critical vendor" of the Debtors and had it not received its pre-petition payments it would nonetheless have received payment in full post-petition under the Court's critical vendor order.

The Court finds that Defendant has failed to meet its burden on summary judgment to show there is no genuine issue of material fact as to whether Defendant would have received payment in full for its preferential transfers in a hypothetical Chapter 7 liquidation due to its status as a critical vendor.  Even though there is no question the Debtors considered Defendant to be a critical vendor that is not enough.  The Debtors were not required to pay Defendant *in full* for its pre-petition invoices.

Thus, Defendant's motion must be denied.

## JURISDICTION & VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## STATEMENT OF FACTS

Vista Analytical Laboratory, Inc. ("Vista" or "Defendant") operates an environmental laboratory and services customers by determining the presence of organic contaminants in bottled samples through the use of an analytical method developed in 1993.[2] Maxus Energy Corporation ("Maxus") is an exploration and production company in the petroleum industry.[3] Tierra Solutions, Inc. ("Tierra") manages certain environmental remediation obligations owed by Maxus to third parties.[4] Pursuant to the Analysis Services Agreement dated November 2, 1992 (the "Services Agreement"), Vista provided Maxus with its aforementioned contaminant determination service.[5] Maxus subsequently assigned the Services Agreement to Tierra.[6]

Under the Services Agreement, Vista and Tierra executed multiple work order agreements, including Work Order No. 1610006VAL00300 at the Diamond Alkali

---

[2] *Declaration of Martha Maier in Support of Defendant Vista Analytical Laboratory Inc.'s Motion for Summary Judgment ("Decl. of M. Maier"),* Adv. Proc. No. 18-50521 [D.I. 36], at ¶ 2–3. *See Decl. of M. Maier,* at Ex. A.

[3] *Declaration of Javier Gonzalez in Support of Chapter 11 Petitions and Requests for First Day Relief ("Decl. of J. Gonzalez"),* Case No. 16-11501 [D.I. 2], at ¶ 5.

[4] *Id.* at ¶ 12.

[5] *Decl. of M. Maier,* at ¶ 4.

[6] *Id.*

Superfund Site on Lister Avenue in Newark, New Jersey (the "Lister Site") dated December 15, 2015 (the "Lister Agreement") and Work Order No. 5313-VISTA-002-0 for the Newark Bay Study Area in Newark, New Jersey (the "Newark Bay Site") dated September 28, 2014 (the "Newark Bay Agreement").[7]

Under the Lister Agreement, Vista sent bottles to Tierra each month, which Tierra used to collect samples from the groundwater treatment plant at the Lister Site.[8]  After Tierra filled the bottles, Tierra shipped them back to Vista for analysis.[9]  Upon receipt of the filled bottles,  Vista performed certain analyses requested in the Lister Agreement and prepared a report stating its findings.[10]  Thereafter, Vista submitted the report to Tierra, along with an invoice, and to a third-party validator selected by Tierra to validate Vista's analyses.[11]  The third-party validator then requested any additional information needed to validate the data and approve Vista's report.[12]  Upon validation, Tierra paid Vista on account of the related invoice.[13]

Under the Newark Bay Agreement, Vista sent bottles to Tierra to collect samples from the Newark Bay Site.[14]  Similarly, Tierra filled and returned the bottles to Vista for

---

[7] *Id.* at ¶¶ 4–5.

[8] *Id.* at ¶ 5.

[9] *Id.*

[10] *Id.* at ¶ 6.

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at ¶ 7.

analysis and third-party validation, and Vista issued Tierra an invoice.[15]   The United States Environmental Protection Agency (the "EPA") also required Vista to conduct certain analyses pertaining to the Newark Bay Site.[16]   After the EPA reviewed and approved the reports, Tierra paid Vista on account of the related invoice.[17]

On June 17, 2016 (the "Petition Date"), Maxus, Tierra, and certain other entities (collectively, "Debtors") filed for chapter 11 relief under the Bankruptcy Code.[18]   The Debtors' chapter 11 cases were jointly administered.[19]   Within the 90 days preceding the filing of the Debtors' chapter 11 petitions (the "Preference Period"), Tierra made six transfers to Vista on account of invoices Vista issued Tierra under the Services Agreement in an aggregate amount of approximately $217,410.00 (the "Transfers").[20]

On July 11, 2016, Vista's Laboratory Director, Martha Maier, engaged in a conversation via email with Tierra's Paul J. Bluestein and Brian Mikucki regarding notice of the bankruptcy.[21]   The emails were sent in the following order:

> **1:16 PM** (from Maier to Bluestein & Mikucki): "Hello Brian and Paul, we just received the notice today that we will not be receiving payment for our work.  I assume will [*sic*] not need to analyze the Lister samples we just received, but just wanted to confirm.  Martha."

---

[15] *Id.* at ¶¶ 8–9.

[16] *Id.* at ¶ 7.

[17] *Id.* at ¶ 9.

[18] Chapter 11 Voluntary Petition, Case No. 16-11501 [D.I. 1].

[19] *See Order Directing Joint Administration of Chapter 11 Cases*, Case No. 16-11501 [D.I. 34].

[20] *See Complaint for Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. §§ 547 & 550 and Objection to Claim Pursuant to 11 U.S.C. § 502(d)* ("*Plaintiff's Complaint*"), Case No. 16-11501 [D.I. 2063], at ¶ 16, Ex. A.

[21] *Decl. of M. Maier*, at ¶ 11, Ex. B.

> **3:19 PM** (from Bluestein to Maier): "Martha, I'm still waiting to get some guidance on the Newark Bay Invoices, which I should have tomorrow.  In the interim, if we were to pre-pay for the Lister samples currently in hand by weeks end would you be willing to go ahead and start the extraction/analyses tomorrow? Paul J. Bluestein, P.E., PMP[.]"

> **6:28 PM** (from Maier to Bluestein): "Paul, Yes, that would be fine. I really appreciate your help on this.  Martha."

> **6:42 PM** (from Bluestein to Maier): "Thanks Martha.  I'll start making the arrangements for payment.  Please go ahead and send me an invoice for those samples.  Paul J. Bluestein, P.E., PMP[.]"[22]

After the Petition Date, on July 19, 2016, Vista filed a proof of claim against Tierra for an amount of $233,840.00, reflecting at least fourteen unpaid invoices owed to Vista by Tierra.[23]  In a document dated August 2, 2016 (the "Critical Vendors Listing"), Debtors calculated that they owed an aggregate of $1,553,488.00 to critical vendors.[24]  The Critical Vendors Listing also provided the following summary description of Vista:

> Project operates under an old administrative order that utilizes an old methodology.  The technology provided by the vendor would be difficult or impossible to get from another vendor as other vendors will have switched to a new methodology.  Changing methodologies would require approval from regulatory agency as it would be a change from the governing administrative order.  Change would take time and require significant cost.  Works at Newark Bay and Lister.[25, 26]

---

[22] *Id.*

[23] *Id.* at ¶¶ 7–9, 12, Ex. C.

[24] *Id.*, at Ex. H.

[25] *Id.*

[26] At footnote 2 of *Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum of Law in Support Thereof* ("*Plaintiff's Response*"), Adv. Proc. No. 18-50521 [D.I. 42], Plaintiff sates the following regarding the materials found in *Decl. of M. Maier*, at Ex. H:

> During discovery in this litigation, the Trustee turned over certain records given to him by the Debtors, including an internal document, marked 8/2/2016 DRAFT /Highly Confidential For Professional Eyes Only/Not for Distribution /Maxus Energy Corporation et al. Critical Vendors Listing. See *Maier Decl.*, Exhibit H. This draft document was prepared by

On August 17, 2016, Debtors moved for entry of an order authorizing, but not directing, Debtors to pay pre-petition claims of certain critical vendors up to a $2 million cap (the "Critical Vendor Motion").[27] The Critical Vendor Motion included the following language at paragraph 18:

> In another instance, one of the Projects operates under an old administrative order that requires use of an older and now obsolete methodology to analyze samples of soil, sediment, water, crabs, clams, and fish. The environmental laboratory that tests samples under this specific administrative order provides technology that would be difficult if not impossible to replace because vendors have switched to a newer methodology. In addition, the Debtors would need to apply to and obtain approval from regulatory authorities to modify the terms of the administrative order if the Debtors were forced to find a new vendor that only utilizes the newer methodology. This process would be time consuming and very costly to the Debtors.[28]

On September 2, 2016, the Court entered an order granting the Critical Vendor Motion and set the cap at $2 million (the "Critical Vendor Order").[29] The Critical Vendor Order includes the following language at paragraph 5:

---

one of Debtors' professionals, a financial advisor. It is in draft format, and it is neither affixed to the Critical Vendor Motion, the Critical Vendor Order, nor incorporated by reference into any documents filed with this Court. See *Kirchner Decl.* Para. 12. As such, it is irrelevant as evidence.

Nevertheless, the Court considers the Critical Vendors Listing as relevant evidence. The fact that "it is neither affixed to the Critical Vendor Motion, the Critical Vendor Order, nor incorporated by reference into any documents filed with this Court" may go to the weight of the evidence but not its admissibility.

[27] *Debtors' Motion for Entry of an Order Authorizing, But Not Directing, the Debtors to Pay Pre-petition Claims of Certain Critical Vendors* ("*Critical Vendor Motion*"), Case No. 16-11501 [D.I. 252], at ¶ 9 ("Following this analysis, the Debtors identified the Critical Vendors, which represent approximately 5% of the Debtors' vendors. As of the Petition Date, the Debtors estimate that they owe the Critical Vendors no more than $2.0 million, which has or will become payable in the ordinary course of the Debtors' business.").

[28] *Id.* at ¶ 18.

[29] *Order Authorizing, But Not Directing, the Debtors to Pay Pre-petition Claims of Certain Critical Vendors* ("*Critical Vendor Order*"), Case No. 16-11501 [D.I. 321].

> The Debtors are authorized, but not directed, to condition the payment of Critical Vendor Claims upon such Critical Vendor's agreement to continue supplying goods or services on Customary Trade Terms or Negotiated Trade Terms for the duration of these chapter 11 cases by executing trade agreements (each a "<u>Trade Agreement</u>").  Such Trade Agreements, once agreed to and accepted by a Critical Vendor, shall be legally binding contractual arrangements between the parties governing the commercial trade relationship as provided therein.[30]

At no time did Debtors enter into a Trade Agreement with Vista.[31]

On September 16, 2016, after entry of the Critical Vendor Order, Tierra paid thirteen of the fourteen outstanding invoices in the total amount of approximately $225,030.00.[32]  On October 10, 2016, Tierra paid the final outstanding invoice (hereinafter, the September 16 and October 10, 2016 payments will be referred to collectively as the "Invoice Payments").[33]  As of November 25, 2016, Debtors paid approximately $1.4 million in total on account of pre-petition claims of critical vendors.[34]

On April 19, 2017, Debtors filed their Disclosure Statement and liquidation plan (the "Plan").[35] The Disclosure Statement included a Hypothetical Liquidation Analysis,[36] and the Plan included the creation of the Liquidating Trust (the "Trust"), under which

---

[30] *Id.* at ¶ 5.

[31] *Declaration of Aine Kirchner in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum of Law in Support Thereof* ("*Decl. of A. Kirchner*"), Adv. Proc. No. 18-50521 [D.I. 43], at ¶ 11.

[32] *Decl. of M. Maier*, at ¶ 14.

[33] *Id.*

[34] *Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors* ("*Disclosure Statement*"), Case No. 16-11501 [D.I. 1232], at Art. IV.B.9.

[35] *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation,* et al. *and the Official Committee of Unsecured Creditors*, Case No. 16-11501 [D.I. 1231].

[36] *Disclosure Statement*, at Ex. D.

the Liquidating Trustee (as appointed by the Liquidating Trust Oversight Board), would have the authority to administer the Trust through certain means, including the ability to prosecute Causes of Action.[37]   On April 19, 2017, the Court approved the Disclosure Statement[38] and on May 22, 2017, the Court entered an order confirming the Plan.[39]   On July 14, 2017, the Plan became effective.[40]

On June 14, 2018, Joseph J. Farnan Jr. ("Plaintiff"), in his capacity as the Liquidating Trustee of the Trust, filed a complaint against Vista.[41]  Plaintiff's Complaint seeks to avoid and to recover $217,410.00 paid in the Transfers as preferential.[42]

On February 8, 2019, Vista responded to each claim in Plaintiff's Complaint and raised twelve affirmative defenses.[43]   On July 1, 2019, Plaintiff and Vista attempted to reach a settlement in mediation, but no settlement was reached.[44]   Thereafter, on

---

[37] *Id.* at Art. I.A.16 (defining "Causes of Action"); *Id.* at I.A.117 (defining "Liquidating Trustee"); *Id.* at Art. I.A.118 (defining "Liquidating Trust Oversight Committee"); *Id.* at Art. VI.A (creating the "Liquidating Trust"); *Id.* at Art. VI.C. (transferring certain Causes of Action to the Trust); and *Id.* at Art. VI.G (vesting the Liquidating Trustee with the authority to prosecute certain Causes of Action).

[38] *Order (A) Approving Disclosure Statement; (B) Establishing Voting Record Date, Voting Deadline, and Other Dates; (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on Plan and for Filing Objections to Plan; (D) Approving Manner and Forms of Notice and Other Related Documents; and (E) Granting Related Relief,* Case No. 16-11501 [D.I. 1237].

[39] *Order Confirming Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation,* et al. *and the Official Committee of Unsecured Creditors Pursuant to Chapter 11 of the Bankruptcy Code*, Case No. 16-11501 [D.I. 1460].

[40] *See Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III) Related Bar Dates*, Case No. 16-11501 [D.I. 1701], at ¶ 2.

[41] *See Plaintiff's Complaint.*

[42] *Plaintiff's Complaint*, at ¶ 16, Ex. A.

[43] *Answer of Vista Analytical Laboratory Inc. to Complaint for Avoidance and Recovery of Preferential Transfers Pursuant to 11 U.S.C. §§ 547 & 550 and Objection to Claim Pursuant to 11 U.S.C. § 502(d)* ("Vista's Answer"), Adv. Proc. No. 18-50521 [D.I. 11].

[44] *Mediator's Certificate of Completion*, Adv. Proc. No. 18-50521 [D.I. 26].

November 27, 2019, Vista moved for summary judgment on Plaintiff's Complaint, arguing that Plaintiff cannot sustain the burden of demonstrating that he is entitled to the relief sought under his Complaint.[45, 46]

## LEGAL DISCUSSION

### A. Standard of Review

Summary Judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[47]

When seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact."[48] A genuine issue is not simply based on opposing opinions or unsupported assertions but rather on conflicting factual evidence over which "reasonable minds could disagree on the result."[49] Furthermore, a fact is material if it could "alter the outcome of a case."[50] In other words,

---

[45] *Defendant Vista Analytical Laboratory Inc.'s Motion for Summary Judgment*, Adv. Proc. No. 18-50521 [D.I. 34].

[46] Vista's Motion for Summary Judgment does not seek summary judgment with respect Vista's other affirmative defenses. *Brief in Support of Defendant Vista Analytical Laboratory Inc.'s Motion for Summary Judgment* ("*Brief in Support of the Motion for Summary Judgment*"), Adv. Proc. No. 18-50521 [D.I. 35], at fn.2.

[47] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[48] *J. Aron & Co. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 504 B.R. 39, 51 (Bankr. D. Del. 2013) (*citing Celotex*, 477 U.S. at 322).

[49] *Liquidation Tr. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citations omitted).

[50] *Id.*

the movant's goal is "to establish an absence of evidence to support the nonmoving party's case."[51]

If the movant meets this initial burden, the burden shifts to the nonmoving party to defeat summary judgment by producing "evidence in the record creating a genuine issue of material fact."[52] To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[53]

The nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of a nonmoving party."[54] This evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[55]

When considering a motion for summary judgment, "the court does not weigh the evidence and determine the truth of the matter; rather, the court determines whether there is a genuine issue for trial."[56] The Court must "view the facts in the light most

---

[51] *Id.* (*quoting Celotex*, 477 U.S. at 325).

[52] *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009).

[53] *Matushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[54] *Giuliano v. World Fuel Servs., Inc. (*In re *Evergreen Int'l. Aviation)*, 2018 WL 4042662, at *2 (Bankr. D. Del. Aug. 22, 2018) (citations omitted).

[55] *In re U.S. Wireless Corp.*, 386 B.R. at 560 (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

[56] *Argus Mgmt. Grp. V. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted)).

favorable to the nonmoving party and draw all inferences in that party's favor."[57] "If the opposition evidence is merely colorable or not significantly probative, summary judgment may be granted."[58] However, where the record could lead reasonable minds to draw "conflicting inferences, summary judgment is improper, and the action must proceed to trial."[59] Summary Judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party.[60]

**B. Analysis**

Section 547(b) of the Bankruptcy Code provides:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property —
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made —
>
> (A) on or within 90 days before the date of the filing of the petition; . . . and
>
> (5) that enables such creditor to receive more than such creditor would receive if —
>
> (A) the case were a case under chapter 7 of this title;

---

[57] *Saldana v. Kmart*, 260 F.3d 228, 231–32 (3d Cir. 2001).

[58] *Whitlock v. Pepsi Ams.*, No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal Oct. 21, 2009) (citations omitted).

[59] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000).

[60] *Id.*

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The undisputed facts indicate Plaintiff has established that sections 547(b)(1) –(4) are satisfied and Vista does not dispute that Plaintiff can carry his burden as it pertains to these subsections.  To summarize briefly, (i) section 547(b)(1) is met because Tierra paid the Transfers for the benefit of Vista; (ii) section 547(b)(2) is met because the Transfers were paid by Tierra on account of invoices Vista issued to Tierra under the Services Agreement, which are "antecedent debts;"[61] and (iii) sections 547(b)(3) and (4) are met as there is no dispute as to Debtors' insolvency during the Preference Period nor that payment of the Transfers occurred during the Preference Period.  As such, the Court is left only to consider the import of section 547(b)(5).

The Third Circuit has stated that "[t]o satisfy the requirements of § 547(b)(5), the trustee must establish that the transfer yielded the creditor a greater return on its debt than it would have received if the transfer had not taken place and it had received a distribution under a Chapter 7 liquidation."[62]  In other words, "when a trustee commences a § 547 preference action, the court is to compare 'what the creditor actually received and what it would have received under the chapter 7 distribution provisions of the [Bankruptcy] Code' in order to determine whether the creditor received more than its

---

[61] A debt is "antecedent" for the purposes of section 547(b) if the debtor's incurred the obligation to pay before the challenged payment was made. *AFA Inv. Inc. v. Trade Source, Inc. (In re AFA Inv. Inc.)*, 583 B.R. 237, 241 (Bankr. D. Del. 2015) (hereinafter, "*AFA*") (*citing In re Vaso Active Pharm., Inc.*, 500 B.R. 384, 393 (Bankr. D. Del. 2013).

[62] *Kimmelman v. The Port Auth. Of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 317 (3d Cir. 2003) (hereinafter, "*Kiwi*").

fair share."[63] The Transfers Tierra paid Vista were in the amount of $217,410.00. Therefore, for summary judgment to be granted in favor of Defendant, Defendant must show that there is no genuine issue of material fact as to whether Vista would have recovered the full amount of the Transfers, i.e., $217,410.00, in a hypothetical chapter 7 liquidation. If Defendant meets this initial burden, the burden will shift to Plaintiff to defeat summary judgment by producing evidence in the record creating a genuine issue of material fact.

Defendant Vista argues that there is no genuine issue of material fact and Plaintiff cannot sustain his burden under section 547(b)(5) because (1) Tierra paid Vista the Invoice Payments pursuant to the Critical Vendor Order, (2) the cost of the Invoice Payments exceeded that of the Transfers, (3) had the Transfers not been made, Debtors had authority to pay the $217,410.00 without adjusting the critical vendor cap, and (4) had the Transfers not been made, Debtors still had not reached the $2 million cap.[64] In response, Plaintiff responds that (1) there is a genuine issue of material fact as to whether Vista's pre-petition general unsecured claim would have been paid in full under a hypothetical chapter 7 liquidation,[65] and (2) the "[Bankruptcy] Code does not contain a critical vendor defense to preference liability," but "[t]o the extent such a defense exists, it applies only in the narrowest of circumstances – none of which are present in this case."[66]

---

[63] *Id.* (*quoting* 2 Collier on Bankruptcy ¶ 547.03[7][a] (15th rev. ed.2003)).

[64] *Brief in Support of the Motion for Summary Judgment*, at ¶ 5.

[65] *Plaintiff's Response*, at 2.

[66] *Id.* at 6.

In *AFA Inv. Inc. v. Trade Source, Inc. (In re AFA Inv. Inc.)*, the court entered a Essential Suppliers Order,[67] which permitted the AFA Debtors to pay certain essential suppliers up to a cap of $6 million.[68]  Pursuant to the Essential Suppliers Order, the AFA Debtors and creditor Trade Source executed a letter agreement, which provided that "Trade Source was to receive payment of its pre-petition claim and, in exchange, would continue to provide its services post-petition."[69]  In the weeks following confirmation of the AFA Debtors' reorganization plan, the AFA Debtors filed a complaint "seeking to avoid and recover a $24,999.99 payment made . . . to Trade Source by check dated [within the 90 day preference period]."[70]  Trade Source filed an answer to the AFA Debtors' preference complaint and the AFA Debtors moved for summary judgment.[71]  The AFA Debtors argued that their Motion for Summary Judgment should be granted because Trade Source was an unsecured creditor and, under a hypothetical chapter 7 liquidation, "unsecured creditors [would] receive less than a 100% distribution under the debtors' confirmation plan of liquidation."[72]  Trade Source asserted that "even in a chapter 7 liquidation[,] it would have received 100% payment of its claim pursuant to the AFA court's Essential Suppliers Order and the parties' related agreement."[73]  The *AFA* court

---

[67] *AFA*, 583 B.R. at 239.

[68] *Id.* at 244.

[69] *Id.* at 239.

[70] *Id.* at 240.

[71] *Id.*

[72] *Id.* at 243.

[73] *Id.*

found in favor of Trade Source because, pursuant to the Essential Suppliers Order, Trade Source and the AFA Debtors executed a letter agreement under which "Trade Source agreed to continue providing services to the Debtors in exchange for payment of its pre-petition claim within nine months," and therefore Trade Source would recover 100% in a hypothetical chapter 7 liquidation.[74]

In reaching its decision, the *AFA* court considered the Third Circuit's decision in *Kiwi*.[75]  In *Kiwi*, the Third Circuit determined that "an unsecured creditor whose claim is paid in full post-petition pursuant to a court order, or court-approved stipulation, cannot then be compelled in a preference action to turn over amounts related to pre-petition payments."[76]  Notably, the Third Circuit so decided because it found payments made to critical vendors pursuant to a court order to be analogous to payments made to contract parties upon assumption of executory contracts under section 365 of the Bankruptcy Code, which require any defaults to be cured.[77]

In *HLI Creditor Trust v. Export Corp. (In re Hayes Lemmerz Intern., Inc.)*, the court entered an order, which permitted, but did not mandate, the Hayes Lemmerz Debtors to pay certain critical vendors up to a cap of $1.6 million (the "HLI Order").[78]  After confirmation of the Hayes Lemmerz Debtors' reorganization plan, one of the Hayes

---

[74] *AFA*, 538 B.R. at 243.

[75] *Id.* (citing *Kiwi*).

[76] *Kiwi*, 344 F.3d at 321.

[77] *Id.* at 318.

[78] *HLI Creditor Trust v. Export Corp. (In re Hayes Lemmerz Intern., Inc.)*, 313 B.R. 189, 191–93 (Bankr. D. Del. 2004) (hereinafter, "*Hayes Lemmerz*").

Lemmerz Debtors filed a complaint against creditor Export "seeking to recover certain alleged preferential transfers . . . totaling $286,385.66."[79]  Export filed a motion to dismiss the complaint, arguing that "the pre-petition transfers at issue are greater than what Export would have received under a chapter 7 liquidation."[80]   The Hayes Lemmerz Debtors responded that the motion to dismiss should be denied because they did not pay Export under the HLI Order, and, even if they did, the HLI Order was "permissive— rather than mandatory."[81]   The *Hayes Lemmerz* court decided in favor of the Hayes Lemmerz Debtors because it found (1) the payments were made before filing the critical vendor motion and before entry of the HLI Order, (2) there was a factual dispute between the parties as to whether the Debtors considered Export a critical vendor, and (3) even if Export received "some payments" under the HLI Order, because it was permissive and not mandatory, "it does not follow that [Export] was entitled to receive payment of all pre-petition claims."[82]   The *Hayes Lemmerz* court further concluded that the permissive nature of the HLI Order distinguished it from contracts assumed under section 365 of the Bankruptcy Code because section 365 "mandates that all pre-petition obligations be paid before a contract is assumed."[83]

---

[79] *Id.* at 191.

[80] *Id.* at 192.

[81] *Id.* at 193.

[82] *Id.*

[83] *Id.* at 194 (citing 11 U.S.C. § 365(b)(1)(A)).

In *Zenith Indus. Corp. v. Longwood Elastomers, Inc. (In re Zenith Indus. Corp.)*, the court entered an Essential Vendor Order on March 14, 2002, which granted the Zenith Debtors "the right, not the obligation, to pay certain discrete pre-petition claims at Zenith's own discretion" up to a cap of $1 million.[84]  Prior to the entry of the Essential Vendor Order, the Zenith Debtors commenced an adversary proceeding against creditor Longwood "seeking to recover $1,317,587 of alleged § 547 preference transfers that were made during the ninety days prior to the petition date."[85]  The $1,317,587 figure "comprises twelve separate transfers, including a $506,035 wire transfer made on the eve of the petition date."[86]  Longwood argued in its twenty-first affirmative defense the so-called "critical vendor defense" to section 547(b)(5).[87]  Longwood's argued that even if the pre-petition transfers had not been made, Longwood would have still received payments from the Zenith Debtors under the Essential Vendor Order because the Zenith Debtors considered Longwood an essential vendor; and because the transfers *would have* been made pursuant to the Essential Vendor Order, the pre-petition transfers cannot be recovered as preferences.[88]  The *Zenith* court rejected Longwood's use of the critical vendor defense.[89]  Specifically, the *Zenith* court held that even if Longwood established

---

[84] *Zenith Indus. Corp. v. Longwood Elastomers, Inc. (In re Zenith Indus. Corp.)*, 319 B.R. 810, 812, 815 (Bankr. D. Del. 2005) (hereinafter, "*Zenith*").

[85] *Id.* at 812.

[86] *Id.*

[87] *Id.*

[88] *Id.* at 814–16 (*citing Kiwi*; *also citing Official Committee of Unsecured Creditors v. Medical Mutual of Ohio (In re Primary Health Systems, Inc.)*, 275 B.R. 709 (Bankr. D. Del. 2002)).

[89] *Id.* at 819 ("[T]he twenty-first affirmative defense was properly struck.")

through discovery that the Zenith Debtors understood it to be an essential vendor, the defense must fail because the $506,035 figure would have drawn objections due to its size relative to the $1 million cap under the Essential Vendor Order.[90] Furthermore, the *Zenith* court agreed with the holding in *Hayes Lemmerz*, which "rejected the analogy to a situation where a debtor assumes a contract pursuant to § 365."[91]

Importantly, the *AFA* court noted the disparity between the alleged preferential transfer and the court-ordered cap for critical vendor/essential supplier payments.[92]  In *Zenith*, the transfer was $506,035 and the Essential Vendor Order cap was $1 million (over 50% of the cap);[93] whereas in *AFA*, the transfer was $24,999.99 and the Essential Suppliers Order cap was $6 million (less than one-half of 1% of the cap).[94]  Thus, the *AFA* court concluded that "unlike *Zenith*, the inclusion of the alleged preference payment in the motion would not have been likely to draw an objection or result in the Court's refusal to enter the [Essential Suppliers] Order."[95]

Regarding, *Hayes Lemmerz*, the *AFA* court distinguished its decision based on whether the creditor-at-issue was identified as a critical vendor/essential supplier pursuant to court order.[96] In *Hayes Lemmerz*, Export was not identified in the HLI Order

---

[90] *Id.* at 817–18.

[91] *Id.* at 817.

[92] *AFA*, 538 B.R. at 244.

[93] *Zenith*, 319 B.R. at 812.

[94] *AFA*, 538 B.R. at 244.

[95] *Id.*

[96] *Id.*

and that order was permissive not mandatory.[97] In *AFA*, however, Trade Source had been identified as a critical vendor and the AFA Debtors "executed a separate agreement obligating themselves to pay Trade Source its pre-petition claim as long as Trade Source continued to provide post-petition services on pre-petition terms."[98]

The Court determines that there is a genuine issue of material fact as to whether Vista would have been paid the full amount of the Transfers, i.e., $217,410.00, in a hypothetical chapter 7 liquidation.  First, the very nature of chapter 7 liquidations often results in general unsecured creditors being paid less than 100% if they are paid anything at all.  Indeed, the Debtors in this case already considered the scenario of a hypothetical liquidation in their Disclosure Statement.[99]  Therein, Debtors provided that "the recovery for General Unsecured Claims is between 2.7-11.5%" based on recovery related to certain litigation.[100]  Although Vista argues that in a hypothetical chapter 7 liquidation it would have been paid the same $217,410.00 under the Critical Vendor Order, had the Transfers not been paid, the Disclosure Statement dictates that were that not true Vista would have recovered less.

Second, unlike in *AFA* where the AFA Debtors and Trade Source executed a trade agreement pursuant to the Essential Suppliers Order, Vista and Tierra never entered into

---

[97] *Id.*

[98] *Id.*

[99] *Disclosure Statement*, at Art. VII.D and Ex. D.

[100] *Id.* at Ex. D.

a separate Trade Agreement pursuant to paragraph 5 of the Critical Vendor Order.[101] The emails between Vista and Tierra, which were sent on July 11, 2016, approximately two months prior to the Court's entry of the Critical Vendor Order, do not satisfy the creation of a Trade Agreement under the Critical Vendor Order.[102]

Third, unlike *AFA* but like *Zenith*, had the Transfers not been made, a transfer to Vista in the full amount of the Transfers would have plausibly drawn objections. The Transfers to Vista were in the amount of $217,410.00, which is approximately 11% of the $2 million cap under the Critical Vendor Order. The *Zenith* court's emphasis on the size of the $506,035 transfer in that case in relation to the relief granted by the Essential Vendor Order does not fall of deaf ears.[103] At the very least there is a genuine issue of material fact that, had the Transfers not been paid, a transfer valued at approximately 11% of the relief requested in the Critical Vendor Order would draw no objections. In other words, a transfer to Vista of $217,410.00 made pursuant to the Critical Vendor Order is more similar to the transfer contemplated in *Zenith* (valued at over 50% of the Essential Vendor Order cap) than to the transfer contemplated in *AFA* (valued at less than one-half of 1% of the Essential Suppliers Order cap.

Fourth, and most importantly, the authority granted the Debtors under the Critical Vendor Order was discretionary. While it is true that all of Vista's unpaid pre-petition

---

[101] *Critical Vendor Order*, at ¶ 5.

[102] *Supra* notes 21–22.

[103] *See Zenith*, 319 B.R. at 818.

invoices were paid under the Critical Vendor Order, the Debtors were not required to do so and it is plausible that an additional $217,410.00 would not have been paid.

As such, the Court will deny Vista's motion for summary judgment because there is a genuine issue of material fact as to whether Vista would have recovered $217,410.00 in a hypothetical chapter 7 liquidation.

This conclusion holds even though there is no genuine issue of material fact as to whether the Debtors considered Vista to be a critical vendor – they did.  Defendant argues that the Debtors considered Vista to be a critical vendor because of the stark similarities between the language pertaining to Vista in the Critical Vendors Listing and the language found in paragraph 18 of the Critical Vendor Motion.  In support of this argument, Vista highlights Debtors' choice of words in the Critical Vendor Motion.[104] Plaintiff argues that Debtors did not consider Vista to be a critical vendor because (1) Debtors did not explicitly refer to Vista by name in the Critical Vendor Motion, and (2) Debtors at no time entered into a separate Trade Agreement with Vista.[105]

The Critical Vendors Listing and paragraph 18 of the Critical Vendor Motion share similar language pertaining to Vista.  In the Critical Vendors Listing, a description of Vista begins by calling it a project that "operates under an old administrative order that **utilizes an old methodology**." [106] The Critical Vendor Motion also begins by describing

---

[104] *See Brief in Support of the Motion for Summary Judgment*, at ¶¶ 18–20.

[105] *Plaintiff's Response*, at 2–3.

[106] *Decl. of M. Maier*, at Ex. H (emphasis added).

a project that "operates under an old administrative order that **requires use of an older and now obsolete methodology**."[107]   Vista services customers through use of an analytical method dated from January 1993.[108]   Moreover, the Critical Vendors Listing's description of Vista reads, "The technology provided by vendor would be **difficult or impossible** to get from another vendor as other vendors will have switched to a new methodology."[109]   Likewise, the Critical Vendor Motion offers, "**The environmental laboratory that tests samples under this specific administrative order** provides technology that would be **difficult if not impossible** to replace because vendors have switched to a newer methodology."[110]

The Debtors were not hiding the ball when they described the "environmental laboratory" that tests samples using an "older and now obsolete methodology" rather than outright naming Vista.[111]   Although Debtors could have named Vista in the Critical Vendor Motion for the avoidance of doubt, Debtors' substantially similar descriptions of Vista in the Critical Vendors Listing and the "environmental laboratory" in paragraph 18 of the Critical Vendor Motion more than suffices.   As such, the Debtors considered Vista to be a critical vendor.   Nonetheless, the fact that the Debtors considered Vista to be a critical vendor, in and of itself, does not mean Defendant has carried its burden on

---

[107] *Critical Vendor Motion*, at ¶ 18 (emphasis added).

[108] *Decl. of M. Maier*, at ¶ 3.

[109] *Id.* at Ex. H (emphasis added).

[110] *Critical Vendor Motion*, at ¶ 18 (emphasis added).

[111] *See Id.*

summary judgment.   As discussed at length above, the case law is more nuanced. Nothing in the Critical Vendor Order required Debtors to pay Vista *in full* for its pre-petition invoices.  Therefore, Vista's argument on summary judgment that if the Transfers were not paid pre-petition it would have been paid pursuant to the Critical Vendor Order must fail.

## CONCLUSION

For the reasons set forth above, the Court finds that there is a genuine issue of material fact as to whether Vista would have recovered the full amount of the Transfers in a hypothetical Chapter 7 liquidation.   Thus, Defendant's motion for summary judgment must be denied.

An order will be issued.